Court. My name is Brian Oates and I represent the appellant Murphy Oil USA. I'm going to focus my time here this afternoon on on two primary issues. The first is the district court's improper implied waiver finding that served as a sole basis for granting Love's summary judgment in Love's favor. The second is the district court's failures in awarding Love's every dollar in Murphy's briefing for specific attorney fee segregation issues and the district court's miscalculation of the lodestar. We're here today on the district court's grant of a summary judgment on one of Love's affirmative defenses. It's important to know what's not before the court and that's whether Love's stole 220,000 gallons of Murphy's diesel during the midst of Hurricane Harvey. That was not challenged in the briefing that's on appeal today. The summary judgment was actually filed before any depositions in the case but what was later developed in the case shows that it's undisputed that Love's took advantage and exploited a situation that amounts to theft. It loaded Murphy's fuel that was not for sale. It used unauthorized loading codes to access that fuel and the bills of lading for each of those loads of fuel showed Murphy's stores as the destination and it's undisputed that Love's took all 220,000 gallons of fuel to Love's stores to sell to Love's customers. I'd like to hear how the damages here could ever exceed $43,000. Your Honor, it's undisputed that Murphy's damages sought in this case are $43,000 and certainly we don't believe that they could exceed that amount. And the very narrow issue that's before this Court is whether Murphy impliedly waived its claims through its conduct. Can't we affirm on the basis of the damages based on the record? I mean we can affirm the district court on any grounds that's apparent in the record, right? Yes, Your Honor. Setting aside the issue of waiver, if Murphy recovered more than what the claim was, how did the claim survive? Judge Wilson, that evidence is not in the record in terms of how much did Murphy recover. There is no evidence in the record regarding Murphy's profits related to the wholesale cost of the fuel that was drafted. In fact, all that Murphy drafted from Love's bank account was the wholesale cost of the fuel. I thought it was 0.29 cents per gallon more than the $43,000 that was withdrawn. That was the bonus added. Judge Costo, what you're, I believe, referring to is what's called the posted price, which the district court in its first summary judgment order that was subsequently withdrawn attempted to analyze. It's important to note that the summary judgment record had no testimony or affidavits submitted that explained the posted price. And what the posted price is, is when wholesale suppliers . . . Murphy has both a retail and a wholesale business. And on the wholesale suppliers list a posted price on certain wholesale sites for wholesale buyers to see. And that's only when there's wholesale fuel available on the market. Murphy's wholesale fuel at this terminal, where it was taken by Love's, it's undisputed it was not for sale. It was turned what's called branded only. During the midst of a hurricane, fuel businesses that have both a retail and wholesale business will typically turn off all their wholesale so that all the retail stores because of the interruptions to the fuel market. And that's what happened here. So there's really no ability to compare the posted price to the ultimate price drafted by Murphy from Love's because that's not . . . the posted price is untethered to the actual wholesale value. We need to compare . . . your damages claim was for $43,000 and lost retail sales, which I understand was what, 19 and a half cents a gallon, I think? Yes, Judge. You're saying if it had gone to our retail stores, we would have made 19 and a half cents a gallon. Didn't you get far more than that by just charging, taking the money out of their bank account? No, Judge Costa, because the posted price is not the fuel's wholesale price. The wholesale price charged was the wholesale price. There's nothing in the record that talks about what is Murphy's net profits on the wholesale fuel, which is what we have in the record for the $43,000 in damages. That is the actual net profits for fuel that travels to Murphy's stores for sale to its customers. So it's not comparing apples to apples. And what the wholesale . . . the drafting of the wholesale price did was it allows Murphy to recover its direct losses due to Love's actions for the cost of the fuel. What is in this case are consequential losses. In other words, losses for being deprived of the opportunity for that fuel . . . When you go in and buy a soda or a candy bar. Correct. Exactly. Lost profits on wholesale merchandise. But that you said was only 19 and a half cents a gallon. Correct. You're a witness. That's right. That's right. But Murphy set the price that it then debited to Love's, correct? It did. It did. It did not reflect on what third parties were selling wholesale fuel during the midst of a hurricane. And that's why the comparison to the postage price is not the proper formula to look at. It's because the postage price does not reflect the fuel shortages associated with the disruption of a hurricane. Remind me, did Murphy ask for additional discovery in the face of the summary judgment motion? No, Your Honor. It did not. No. The initial summary judgment was filed shortly after Murphy . . . Part of the interesting piece of this case is Murphy uncovered that it was damaged to approximately $43,000 in the summer of 2019. And it approached Love's to say, let's dismiss this case pursuant to Rule 41A because it doesn't make business sense to continue incurring costs and fees to fight about $43,000. And Love's declined that. And in response . . . They declined it because it was without prejudice. Yes, Your Honor. It didn't make any business sense. Why didn't Murphy take the district judge's offer to dismiss with prejudice? Judge Wilson, it's because Murphy was the victim. It had 220,000 gallons of diesel that was not for sale stolen from it in the middle of a hurricane that significantly impacted its operations. It had numerous stores throughout Dallas-Fort Worth that were out of diesel because of Love's actions. If you bring a lawsuit and it ends up your damages are only $43,000 and people are accruing on both sides hundreds of thousands of dollars in fees, I mean, whether you were wronged or not, that's a bad business decision. And it seems like what was really going on is your client, you saw the fees . . . with prejudice dismissal was going to result in fees. But you could have cut your losses then. With prejudice dismissal would have ended the accrual of fees, right, on both sides. Yes, Judge Costa. However, at no point, whether at that time in July of 2019 or today, do we believe the merits of Murphy's Theft Liability Act claims were invalid. We believe that even today, that setting aside this improper waiver finding, that Murphy could still prove that Love's intentionally stole its fuel. And as a result, Murphy was not going to reward by reimbursing attorney's fees to the party who had stolen from it during the midst of the hurricane. Is it theft if you got paid for it? Yes, Judge Wilson. Is it theft if you got paid for it at the price you asked? Absolutely, because all that was was paid for . . . and I think it's important to note how Murphy recovered the amount. Because Murphy had historically sold wholesale fuel to Love's, it was able to automatically draft the bank account. This wasn't a situation . . . Doesn't that mean you could have gotten whatever price you think it was worth? In other words, it wasn't a negotiation. You just pulled it directly out of the bank account because you generally had authority to withdraw from their account. So you were getting the price you thought the gas was worth, right? Yes. Murphy recovered the wholesale cost of the diesel, which is separate and apart from the consequential losses that Murphy suffered. Then tell me what the theft was. Yeah, the theft. So Murphy stored diesel at a third-party terminal, and so it had its fuel carriers that were able to access fuel from this third-party terminal, and that fuel is accessed . . . I understand all that, but what was stolen? The diesel. That was not for sale. You got paid for it. After the fact, yes, the wholesale cost of the diesel was recovered. But Murphy was deprived of the customers, which Luggs benefited from. Luggs was able to take that stolen fuel, and it made its merchandise profits. It served its customers, which Murphy was deprived of, and that's the whole reason for this lawsuit. So these $40,000 in damages that we're talking about, they're not . . . they can't be viewed as offset by the difference in the posted price and the price drafted. That is not an apples-to-apples comparison. You're comparing net profits on one end, on one hand, to a price that is entirely . . . the posted price that's entirely irrelevant to the fuel. And so it's not in the record whether or not . . . because what this court is really thinking about is whether or not Murphy's damages are offset, right? And that's what the district court purported to do in its original opinion, which Murphy followed a motion for reconsideration, and the court withdrew that opinion because it recognized it was comparing something to net profits. And we're not sure what that something is, but it certainly wasn't Murphy's net profits in the amount drafted from Luggs. It was just . . . all that's in the record is that Luggs' account was drafted a certain amount for the wholesale cost, and Murphy has profited into the record $43,000 in additional damages associated with the fuel that would have been sold at its retail stores. Now, your consequential damages, you were claiming millions of dollars, right? At the outset, that is what we believed, and Murphy, frankly, still believes that. But as we were reviewing the information in which Murphy collects and retains, you know, understanding that the damages, you know, pursuant to the case law, you have to prove there's reasonable certainty. That reasonable certainty, it turned out to be $43,000, which was much less than Murphy still believes it suffered in terms of lost customers and reputational harm. If you . . . if the court focuses on what the district court looked at for an implied waiver finding, and this case is an implied . . . is an implied waiver case, so there has been unequivocal manifestation of intent to waive its claims. Unequivocal manifestation, and that simply doesn't exist here. The district court relied solely on the fact that Murphy drafted Love's bank account. There are no . . . there's no testimony. There's no explanation regarding why that was done, what was recovered, what was recouped. All the questions that this court is asking today, it's not in the record. I thought the waiver under Texas Law, it's an or. Intentionally waives, which is the subjective element, or engages in conduct inconsistent with the right. Is it not? Absolutely, it is. Absolutely, it is, Your Honor. It is, too. It is right. But it's also intentional conduct inconsistent with claiming that right. And the only evidence in the record that the district court relied on is the drafting of the bank account, which, at best, is a fact issue with respect to what Murphy's intent was in drafting the account, because it's not accompanied by any testimony or any other evidence. And, in fact, the evidence in the record actually shows the opposite, that Murphy intended to preserve its claims and pursue them as opposed to waive their claims. Two weeks after it drafted Love's bank account, it sent a correspondence to Love saying that Murphy had been harmed, and it asked Love's, what did it plan to do to rectify the situation? The following month, Murphy again sent correspondence to Love's, saying that it had suffered consequential damages, including lost profits and reputational damages. That is the opposite. That's the antithesis of waiver. That is specifically stating, we will pursue our claim. And neither Love's nor the district court has cited a waiver. It stands for the proposition that drafting a party's bank account for the wholesale cost of a good amounts to waiver. And, to the contrary, in Murphy's briefing, we cite multiple cases that says, and to Judge Wilson's point, accepting payment does not constitute waiver as a matter of law. And we think the same should follow here today. You didn't accept payment, though. You took what you thought you . . . It's different when someone sends you a check, and you say, here, let's settle this, and you take it, and someone . . . I mean, here, you grab what you thought was yours. Judge Costa, that is correct. I would say, though, that invoicing a party and saying, will you please pay this, and they voluntarily paying it, is actually more indicative of a waiver, of a relationship, of a business transaction than what occurred here, where a party unilaterally drafted it, and Love's didn't say, you know, here's a check for the wholesale diesel, and this is in full and final, you know, a settlement of the amount. Because the record is devoid of evidence showing that Murphy had an unequivocal manifestation of an intent to waive its claims against Love's, the District Court's order should be reversed, and the case should be remanded for trial. And all of the points that this Court has addressed regarding damages are certainly something that a fact finder in the District Court can take up about whether or not Murphy has been made whole, but that was not the basis of Love's summary judgment. It was only on waiver, and waiver is the only thing the District Court purported to find, and there is no implied waiver as a matter of law in this case. I see that I'm out of time, so I will conclude my remarks. Yes, you've saved time for rebuttal. Thank you, Judge Costa. Mr. Rosen, Charlone? Charlone, Your Honor. Good afternoon, and may it please the Court. On both issues before us, waiver and attorney's fees, Murphy is attacking a straw man. What I'll do first is summarize two of the straw man arguments, then I'll discuss each in more detail. Regarding Murphy suggests it occurs only through subjective, actual intent to relinquish a right. This is incorrect. Intentional conduct inconsistent with a right also begets waiver. The test is disjunctive. Intentional relinquishment, aka express waiver, or intentional conduct, aka implied waiver. Either prong is independently sufficient. But Murphy exhibits tunnel vision for the first prong. Subjective, actual intent, even though Love's arguments and the District Court's opinion are premised on the second prong, intentional inconsistent conduct. This is straw man number one. Regarding attorney's fees, the law on segregation is clear. If a legal service that advances a claim for which fees are available also advances a claim for which fees are unavailable, the service need not be segregated. Murphy contends that performed. This is straw man number two. Because the record tells a very different story. Specifically, that Love's performed a granular, quantitative analysis of the services to show that 98% need not be segregated. Why? Because they advanced the defense against recoverable and non-recoverable claims. Waiver. On the attorney's fees, it does seem, and there's that bar graph in the brief, the other side's brief, I think, that's illuminating. It does seem odd to me that all this action's ramped up after summary judgment was filed. I mean, typically the whole point of getting, well, obviously you want to win the case, but also with summary judgment, the idea is we can stop having to incur costs that we would have to incur if we went to trial. So usually there's sort of a stand down period until the court rules on summary judgment. And then, yeah, if it denies it and it's headed to trial, everyone gets working like crazy. But, I mean, explain why there was so much action while the summary judgment was pending. Well, let me say, first off, that Murphy itself predicted that the majority of the litigation activity would post-date its desire to dismiss the case in July of 2019. In fact, it specifically said when it was trying to dismiss that the bulk of litigation activity lies ahead. And to your point, Your Honor, there's nothing we would have liked more than for Murphy to have cut its losses and accepted Chief Judge Lynn's invitation to dismiss with prejudice. But they chose not to when they were given a choice. And what happened was precisely what Murphy predicted. The bulk of the litigation activity ensued. So that was precisely why, for example, that Judge Starr in the proceedings below said, look, you really can't fault Loves for doing and incurring the fees that you yourself, Murphy, predicted would happen if you chose to continue litigating. Counsel, are there any unjust enrichment fees that are not, that are within the district court's award? In other words, not talking about the ones that are overlapping, are there any segregated fees that were included in the total awarded? We don't believe so, Your Honor, no. In other words, the lawyers excluded the ones that you came to 2 percent or whatever it was that would have related to that claim? We both specifically included particular line items and then engaged in an analysis on a really a line-by-line basis of the discovery we conducted, the briefing that we submitted, and the depositions that we took. And we divided those into buckets in terms of what was common to the recoverable claims. That was authorization, defenses, and damages. And on a very granular level, we determined that 98 percent related to those buckets. And that served as the estimate for reaching that 98 percent figure. So, even though this is a case in which intentional conduct is the issue, Murphy's criticism of the district court is this, quote, instead of looking to Murphy's subjective intent and ascertaining whether it actually intended to waive its claims, the district court decided to impute intent into Murphy's actions. And we agree. That is exactly what the district court did. And that was 100 percent appropriate. Sometimes, waiver is a party's actual intent to relinquish a right. And at other times, like here, waiver is something very different. It's intentional conduct inconsistent with a right. Again, two disjunctive prongs. So, how is it inconsistent necessarily with an intent to preserve claims that they intended to pursue? In other words, in grappling with this, I think to some degree we're here because Murphy took the price that it named, and it was more than the wholesale price or whatever. In other words, whether it's profit or not profit, they decided on a price, and they debited loves for that, right? And that's the basis that we're saying, well, that was conduct that was inconsistent with preserving its claims. What if it had taken $1.50? In other words, if it was 30, 20, 30 cents below the wholesale, I mean, would your position be that Murphy had no intention of pursuing the remainder in litigation, in claims? In other words, I mean, putting aside the particular facts of the situation, how is this necessarily conduct that implies a waiver? You're sort of suggesting a rule of reason or a smell test of sorts. No, I'm just trying to set aside the maybe anomaly here that Murphy named this price and that we really have law that says they couldn't pursue that, right? Well, I think the other thing we need to bear in mind— Same conduct, different price. Sure. I think we need to bear in mind that notwithstanding what counsel for Murphy has said, the intentional inconsistent conduct is not limited to the, quote-unquote, drafting of is that Murphy discovered that Loves had, quote-unquote, stolen the fuel because we specifically brought it to their attention. We didn't hide anything. And then what happened was not that they simply debited an amount from our account. What then occurred was that Murphy management, at the highest level of the company's diesel organization, got involved and they deliberated and they decided, what are we going to do now that we have full knowledge of this alleged theft? And what they did is they went to the marketplace and they looked and said, what were other entities selling diesel for during Hurricane Harvey? Which is to say, at prices that have already been adjusted for crisis conditions that recognize low supply and high demand. And based on the market research that those ranking executives at Murphy conducted, they then selected a price at the high end of that spectrum. And that became the price that they invoiced us at. And before they even sent the invoices, a Murphy representative, the head of the diesel organization at the company, wrote to Loves and said, this is what we are going to charge you. Only thereafter did Murphy invoice us and did they then get paid. So the sort of myopic focus on the drafting is not consistent with the facts in the record. But it still all relates to the price. I mean, that's what the district court's opinion says. It's about the invoicing and it's about accepting the payment. But my point is that does that conduct necessarily imply a waiver of pursuing any other claims or damages they might have? Based on the facts that I just recited, I think it would be very odd for someone to bill, in effect, a thief. And then, you know, two weeks later, call the police for the first time to say the person that we billed and who paid us, we've now decided that they stole from us. That, to me, does not make sense. We have a corpus of intentional conduct, a series of deliberate decisions that I just described that are only then modified in some way by conduct occurring 16 days later. And in effect, what that means is that we would not have anything called implied waiver anymore. Because what would happen is in every context like this, when someone has seller's remorse, they could just unring the bell and say, whatever our objective intent might have telegraphed to the outside world, our unarticulated internal motive was to sue you. And to be able to freely available to any party accused of waiver. So I just don't think that that sort of collapsing of the distinction between implied and expressed waiver would be appropriate or fair. Except they're not a seller here. The gas had been taken, correctly? That is a debatable point. We're trying to get out of a transaction that they initiated. The gas was already gone. That is true, Your Honor. The gas was already gone. Again, the specifics of whether or not there was a theft, whether or not this loading code was used properly or improperly are debated issues. We don't agree with what Murphy has said. We describe in detail in our briefing why we have a difference of opinion. But ultimately, whether Love's engaged in theft or conversion is, I think, irrelevant to the waiver analysis. Your Honor, if I could continue. I'll move to fee segregation because it seems like we've exhausted the waiver issue. If a legal service, as I mentioned previously, performs double duty, if it promotes the defense against multiple claims for which fees are variously recoverable and unrecoverable, the service need not be segregated. Now, Murphy argues that Love's only evaluated whether the facts were interrelated to the exclusion of legal services. And again, this is the second straw man argument because the truth is that Love's examined overlapping law, overlapping facts, and overlapping legal services. And all three were necessary and appropriate. The first thing Love's did was to take inventory of Murphy's four claims. First, the elements of conversion and the Texas Theft Liability Act are functionally identical. Two, conspiracy is a is not an independent cause of action. But regardless, Murphy explicitly abandoned its prosecution. Now, according to Murphy, Love's stopped right there. But the reality is that there was much more to Love's segregation analysis. Love's next step was to observe that the only two claims actively in play are flip sides of the same coin, a statutory theft claim and a common law conversion claim. And as a practical matter, both causes of action hinged on the same three issues. Authorization, did Love's have permission to take the diesel? Two, defenses, were Murphy's claims precluded by Love's affirmative defenses, including waiver and damages? Did Murphy sustain any? And if it did, in what amount? I'm actually less concerned about the segregation than I am about, you know, the Anderson factors. One of the reasonableness factors, common sense, says the fees should be proportionate to the amount in controversy. And here you're incurring hundreds of thousands of thousands in fees after you know that their own expert is saying at most they can get 43,000. So how is how is that we have two periods in this case, right? We've got the pre-July 2019. When they said it was a million dollar case, I don't have any qualms with reasonable news, but once they come out and say, oh boy, this is at most our own our own guy is saying this is a $43,000 case. Doesn't then a little more vigilance on fees come into play? Well, here's what we'll say, Your Honor. First of all, if I could if I can draw some focus to the dichotomy, because we've got we've got quite a bit of fees that occurred before in addition to the fees that occurred after. And up until July of 2019, the two parties had billed approximately the same number of hours, 1,100. And we brought out in our brief that at those 1,100 hours, we billed an average of about $282 an hour, which was less than Murphy's Paralegals. So it seems to me that up until July 2019, there can't be any debate about the fees. Now, thereafter, remember, this is the first time that we're finding out about the damages figure going from, you know, $12 million to $42,000. And Judge Starr wrestled with this. He looked at this, and he had a couple of reactions. He said, number one, whatever the And here's what he said. He said, quote, And so the other thing that Judge Starr mentions, which frankly has nothing to do with money, but I think is important here, particularly since Murphy's ostensible impetus for bringing this case in the first instance was damage to its own reputation, Judge Starr recognized that there was a non-monetary component here. Murphy didn't just accuse Loves of theft. It accused eight truck drivers of a felony crime. And vindicating one's reputation is appropriate. And the district court, as I indicated, correctly, It was covered in the media, and we cited at least one such piece of news in our briefing. We did. We cited one of the news items, and there were more than what we actually cited. Now, the one thing I want to remind the court here, and I realize that I'm probably emphasizing the obvious, but the Fee Award is here on abuse of discretion and clear error review. I don't want to lecture your honors about what that means, but clear error for its part has to strike y'all as being not just sort of maybe wrong or probably wrong or, hey, we would have done it differently, but according to that wonderfully colorful decision, it has to strike you as wrong with the same force as a dead, unrefrigerated, five-week-old fish. I don't think there's any reality in which Judge Starr's decision would fall into that standard of review. If the court has nothing further, I'm happy to rest on the briefs. Thank you very much for your time and attention today. Thank you, Mr. Charlon. Mr. Oates, you've saved some time. Thank you, Judge Smith, and may it please the court. I just have two points on rebuttal. The first is that Murphy never sued for the wholesale cost of the diesel. What Murphy sued for was the consequential damages, the lost profits. Murphy agrees that certainly intentional conduct inconsistent with a known right serves as a basis for implied waiver. There's no dispute between the parties on that. What's disputed is whether or not Murphy's drafting the wholesale cost, which is the direct losses for the cost of the diesel, somehow weighed losses like lost profits from merchandise sales, lost customers, and reputational harm. Those are two separate, wholly separate types of losses, and one, drafting and recovering one, cannot be seen as an implied waiver of the other. The second are with respect to Judge Costa and your questions regarding the attorney fee issue and the uniqueness with respect to the amount of fees incurred after Love's filed a summary judgment that's on appeal here today. Love's summary judgment was filed prematurely before any depositions had taken because it was a knee-jerk reaction to Murphy's offer of dismissal pursuant to Rule 41A. It was a clear attorney fee grab under the Texas Self-Liability Act prevailing party fee provision. Love's incurred the majority, 70 percent of the fees in which it was against public policy. After July 11, 2019, Love's racked up $713,000 in fees, billed nearly 2,500 hours, all on a $43,000 case, a case that we told them there's $43,000 in damages. Those fees are unreasonable, especially in light of Love's refusal to agree to dismiss the case and stop all additional attorney's fees from being incurred. Instead, this case turned into Love's used the Texas Self-Liability Act as like a de facto counterclaim, and so Murphy was forced to remain in the case to ward off Love's attorney's fees claims, allowing and rewarding that type of behavior foments litigation and encourages unreasonable litigation tactics, which I think this court is seeing here today. A party certainly has the right to have its attorneys work as vigorously and aggressively and as much as possible, but they can't simply take those fees incurred as a result of their decisions and pass them lock, stock, and barrel to the other party pursuant to prevailing party attorney fee provision. If there was ever a case that dictates a significantly reduced fee this one. The underlying facts show that Murphy suffered theft of 220,000 gallons of its diesel. It offered to dismiss the lawsuit early in the case before the majority of the litigation tasks had been undergone and the fees incurred. Love's refused and racked up 70% of the fees in which they seek to have affirmed here on appeal, and the amount in controversy is $43,000. Love's fees incurred after Murphy offered a rule 41A dismissal should be subject to a heightened scrutiny analysis with respect to reasonableness, and the district court didn't do that. The district court didn't take that into account at all, and as a result, the attorney fee award amounts to clear error. Unless the court has any further questions, I have no further statements. Yes, thank you, Mr. Ochoa. The court will take that short.